IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

**EDWARD PELROY,**

       Plaintiff,

    v.

**MICHAEL J. ASTRUE,** Commissioner
of Social Security,

      Defendant.

Case No. CV 09-6128-HU

**FINDINGS AND
RECOMMENDATION**

Kathryn Tassinari
Robert Baron
Harder, Wells, Baron & Manning
474 Willamette, Suite 200
Eugene, Oregon 97401
    Attorneys for plaintiff

Dwight Holton
Acting United States Attorney
District of Oregon
Adrian L. Brown
Assistant United States Attorney
1000 S.W. Third Avenue, Suite 600
Portland, Oregon 97204

David Morado
Regional Chief Counsel
L. Jamala Edwards
Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel

Findings and Recommendation Page 1

701 Fifth Avenue, Suite 2900 M/S 901
Seattle, Washington 98104
     Attorneys for defendant

HUBEL, Magistrate Judge:

     Edward Pelroy brings this action pursuant to Section 205(g) of the Social Security Act (the Act), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of the Social Security Administration (Commissioner) denying his application for disability insurance (DI) benefits under Title II of the Social Security Act.

### Procedural Background

     Mr. Pelroy filed an application for benefits on July 6, 2007, with an alleged onset date of February 23, 2007. The application was denied initially and on reconsideration. Mr. Pelroy requested a hearing, which was held on September 3, 2008, before Administrative Law Judge (ALJ) Marilyn S. Mauer. The ALJ issued a decision finding Mr. Pelroy not disabled on October 1, 2008. On March 11, 2009, the Appeals Council denied Mr. Pelroy's request for review, making the ALJ's decision the final decision of the Commissioner.

     Mr. Pelroy was born in 1949 and was 59 years old at the time of the ALJ's decision. He graduated from high school and attended diesel trucking school. He served in the Marine Corps from May 13, 1968 to June 7, 1972, in combat duty. His past relevant work has been as a garbage collector/driver, a delivery truck driver, a construction worker, and a heavy equipment operator. His last job was long haul truck driving, picking up animal carcasses from meat

Findings and Recommendation Page 2

packing plants, animal shelters and the like, and transporting them to product manufacturers and disposal sites. See, e.g., tr. 372. It is not entirely clear from the record whether Mr. Pelroy quit his last job, was laid off, or was terminated after conflicts with supervisors.[1] Tr. 252. He has not engaged in substantial gainful activity since February 23, 2007. He alleges disability on the basis of post-traumatic stress disorder (PTSD), musculoskeletal pain, and respiratory disease.

**Medical Evidence**

On July 27, 2000, and on January 8, 2004, Mr. Pelroy was examined by Oscar Leyva-Yapur, M.D., to review his Veterans' Administration (VA) disability rating for PTSD. Tr. 330, 445. At the time of the January 2004 examination, Mr. Pelroy's disability rating for PTSD was 50%. Tr. 331. On a PTSD checklist administered by Dr. Leyva-Yapur, Mr. Pelroy had a "moderate" score, 56 out of a possible total of 85, on the basis of nightmares, flashbacks, anxiety attacks with triggers, social phobias, occasional bouts of anger and irritability, sleeping problems, restlessness, and hyper-vigilance. Id. His wife reported that he isolated himself, needed to drink almost daily, and, while sleeping, was restless and subject to nightmares. Id.

///

---

[1] The ALJ found that Mr. Pelroy quit the job on the alleged onset date, February 23, 2007. Tr. 17. However, a psychologist performing a records review on behalf of the Commissioner wrote that Mr. Pelroy had been fired after conflicts with bosses. Tr. 252. Dr. Turner wrote on April 30, 2007 that Mr. Pelroy had been laid off from his job due to mental and physical health concerns. Tr. 340, 371, 372.

Mr. Pelroy described bouts of depression, reckless and impulsive thinking, passive suicidal ideation, hyper-vigilance and periods of high anxiety. Tr. 332. He was trying to continue working, but did not know how much longer he could "put up with the pettiness in people." Id. He wished to be left alone. Id. He was on an antidepressant, citalopram (Celexa), but Dr. Leyva-Yapur thought he was at a subtherapeutic dose. Tr. 333. Dr. Leyva-Yapur noted that Mr. Pelroy had no history of mental hospitalizations or antipsychotic medication, but that he "maintains visits with Vet Center therapist." Tr. 331. Dr. Leyva-Yapur diagnosed PTSD, chronic, trauma and combat related; alcohol dependency; and impulse control disorder. Tr. 332.

Mr. Pelroy's disability rating for PTSD was increased to 70% effective January 13, 2003, tr. 138, along with a 10% disability rating for a lower leg muscle injury caused by fragment wounds. Tr. 329, 384.

A CT scan of the thorax on September 26, 2006 showed diffuse reticulonodular changes throughout the lungs, worse in the upper lobes, and scattered areas of parenchymal banding with some small, calcified granulomas. Tr. 390. The appearance was explainable by Mr. Pelroy's history of silicosis in 1998, with a left partial lobectomy. Id. The diagnostic impression was diffuse lung disease. Id. Mr. Pelroy was diagnosed with sleep apnea on June 10, 2006, for which he uses a Continuous Positive Airway Pressure (CPAP) machine. Tr. 405, 443.

///

Mr. Pelroy began psychotherapy every other week with Rex Turner, Ph.D., a psychologist, on July 25, 2005. Tr. 328. The last session in the record occurred on October 30, 2008. Symptoms described to Dr. Turner by Mr. Pelroy and his wife, Catherine DeWolf, or observed by Dr. Turner, included emotional numbing, see, e.g., tr. 381 (mental status examination in October 2006: "apathetic, detached,"), tr. 377 (Dr. Turner's observation that Mr. Pelroy looking "thinner, tired, disheveled," showing "poor self care," and with a "constricted, rather flattened affect"), tr. 332 (reporting wish to be left alone), tr. 348 (reporting feeling disconnected from his wife's health problems and his brother's heart attack), tr. 440 (wife's complaints that Mr. Pelroy "has not said more than 'hi' to me in over a week," is "totally checked out," "watching DVDs isolated in a room by himself," "doesn't go to bed with me, doesn't come out to eat or say goodnight"); irritability, see, e.g., tr. 357 (wife's complaints that he snapped at her out of moodiness); anger, tr. 352 (losing his temper with his granddaughter), tr. 352 (wife's report that Mr. Pelroy had behaved "cruelly" toward herself and their granddaughter), tr. 346 (easily angered with his wife), tr. 409 (road rage), tr. 357 (fighting with people at work, "having such troubles with my boss"); tr. 448 (wanting to "choke the shit" out of a co-worker); hypervigilance, see, e.g., tr. 380 (wife's report that he had jerked her arm and barked at her when he thought she would fall), tr. 349 (feeling jumpy); anxiety, see, e.g., tr. 357 (worried about not coping); tr. 341 (mental status exam, anxious affect);

difficulty concentrating and short term memory loss, see, e.g., tr. 341 (complaints of increasing problems with concentration and short-term memory functions), tr. 358 ("veteran has shown some impairment in memory from PTSD escalations, inability to concentrate at time"), tr. 373 ("problems with recent memory function due to anxiety"); and nightmares, tr. 346, 337.

The situations described by Mr. Pelroy at these sessions included stressful, physically exhausting work, see, e.g., tr. 386 (working 58 hours per week), tr. 376 ("swamped," working 60 hours per week, carcasses "in horrible shape,"), tr. 368 ("hating" his job), tr. 341 (animals being shot and collecting the carcasses); marital strife, see, e.g., tr. 351, 381 (wife "threw him out" for two days), tr. 488 (lack of sexual intimacy); financial difficulties including the loss of an $80,000 inheritance by his wife's investment in a business that failed, see, e.g., tr. 460, 472; and social isolation, see, e.g., tr. 295 (not wanting to go out; preference for being alone in his room), tr. 488 (staying in his room, watching movies).

Mr. Pelroy and his wife Cathy also attended marital counseling every two weeks with Andrea Roth, a therapist supervised by Dr. Turner. In October 2006, Ms. Roth noted Cathy's concerns about Mr. Pelroy's health, and her desire to see him stop working. Tr. 379.

On November 27, 2006, Mr. Pelroy reported to Dr. Turner that his employer had given him notice that he would be laid off. Tr. 372. Mr. Pelroy expected to lose his job in two weeks, during which time he would train a replacement. Id. Dr. Turner noted that Mr.

Findings and Recommendation Page 6

Pelroy was "very concerned" about having to retire, and about his "failing health and deteriorating injuries." Id.; tr. 373.

On December 4, 2006, Dr. Turner recorded a disclosure from Mr. Pelroy's wife that she had called Mr. Pelroy's boss and said he was unsafe and showing compromised judgment, and that she was worried he would cause harm driving his truck with chronic fatigue and pain, sleep deprivation, and excessive work hours. Tr. 371. Dr. Turner wrote, "The veteran was laid off his job for causes of safety following this phone call, but perhaps for other reasons as well." Id.

On January 8, 2007, Mr. Pelroy and his wife discussed with Ms. Roth a physical altercation in which Cathy said she was "hysterical" and "freaking out" about Mr. Pelroy's continued employment, and Mr. Pelroy had become angry, grabbed her by the shoulders, and forced her to sit down. Tr. 366. During a session the same day with Dr. Turner, Mr. Pelroy said he wanted his employer to lay him off "because of my back and health problems," but that they were "wanting to act like I just quit so they don't have to pay [unemployment] benefits." Tr. 368. Dr. Turner noted that Mr. Pelroy was "negative for the first time about 'hating' his job." Id.

On January 18, 2007, Mr. Pelroy was assessed for possible Agent Orange exposure. Tr. 360. According to his military records, he had served in the First Marine Division, assigned to Vietnam between February 1969 and April 1970 and again from January 1971 to March 1971 as a mortarman, machine gunner, and rifleman. Id. Mr.

Findings and Recommendation Page 7

Pelroy denied handling or spraying Agent Orange, but was certain he had been in recently sprayed areas, been directly sprayed with Agent Orange, and eaten food or drunk water in areas that had been sprayed. Id. No objective findings consistent with Agent Orange exposure were noted. Tr. 362. His medications at that time were citalopram for depression; lovastatin to lower cholesterol; and prazosin for nightmares. Tr. 364.

On February 5, 2007, Ms. Roth recorded that the Pelroys had discussed with her Mr. Pelroy's lack of interest in sex. Tr. 355. On that same date, Dr. Turner wrote that Mr. Pelroy described his boss giving him a new employee to train and saying, "Finish it up and then you quit." Tr. 357. Mr. Pelroy said, "[M]y boss wouldn't sign a paper so I could get unemployment. My boss keeps telling me I'm quitting; I keep telling him that he's laying me off for health reasons." Id. Mr. Pelroy said that at work, "they are fighting with me all the time," and that his wife complained that "I snap at her out of moodiness," and "I'm worried that I'm not coping as well as I could." Id. Dr. Turner observed that Mr. Pelroy was "talkative, intermittently 'spaced out,'" saying that losing his temper so easily

> makes me much more nervous subjectively, because the first lesson drilled into you in the Marine Corps is that notion that you have to be correct and cannot lose your cool ... I feel like I have to keep everything in my head totally cool ... maintaining basic Marine Corps training to manage my emotions, to stuff them down. It was always dangerous not to ... but lately I'm getting so stressed that I cannot seem to get everything together.

Id.

Mr. Pelroy stopped working in February 2007. On March 5, 2007,

Findings and Recommendation Page 8

Mr. Pelroy met alone with Ms. Roth, reporting that although he felt more relaxed since retiring, he and his wife were fighting more. Tr. 351-52. Mr. Pelroy also expressed concern about losing his temper with his granddaughter and worrying that he had begun to feel apathetic toward his wife's chronic anxiety attacks. Tr. 352. Mr. Pelroy's wife spoke by telephone to the therapist, saying that Mr. Pelroy had been behaving "cruelly" toward herself and their granddaughter. Id.

That same day, Dr. Turner noted on mental status examination that Mr. Pelroy's mood was "intermittent depression and apathy," that his affect was restless, and his speech "somewhat rambling and disjointed." Tr. 353. Mr. Pelroy told Dr. Turner that when his wife "gets in a blue mood, I get in a blue mood, but I'm having more and more trouble caring about all these dramas." Id.

On March 26, 2007, the Pelroys told Ms. Roth they were "doing terrible." Tr. 350. Mr. Pelroy's wife said she was having heart problems indicating that she was experiencing panic attacks; she was also frustrated with Mr. Pelroy's apathy toward her health issues. Id. Mr. Pelroy said he was frustrated with his wife's demonstrations of emotion, and her belief that further counseling sessions were necessary. Id.

On April 2, 2007, Mr. Pelroy reported feelings of disconnectedness from his wife and from his brother who had recently had a heart attack. Tr. 348. Psychological testing revealed a score of 65 on the PCL-M,[2] far exceeding the cut score

---

[2] PTSD Checklist-Military. See

Findings and Recommendation Page 9

for Vietnam combat veterans. Tr. 349. Mr. Pelroy endorsed emotional numbing, irritability, anger outbursts, and feeling jumpy. Id. Dr. Turner noted that these symptoms were the ones his wife was most verbal about when she described Mr. Pelroy's behavior to marital therapists and to Dr. Turner. Id. Mr. Pelroy said he felt that his wife was "very loving and kind," and that she tried to help him. Id. But, he said, he spent a great deal of time in a room watching TV, even though it was apparent that he was wasting time. Id. Dr. Turner noted that exacerbation of PTSD symptoms is "common when veterans go into retirement adjustment and have more unstructured time on their hands." Tr. 351.

On April 16, 2007, Mr. Pelroy told Dr. Turner he still got "angry really easy," and got "upset with Cathy if she does something stupid." Tr. 346. He said the medication he was taking made his nightmares less frequent, but "I still have them. Cathy clears the bed when I start swinging my arms and flailing about, or she'll tap me on my side and get me away from her so she doesn't get hurt..." Id. However, Mr. Pelroy said his sleep disturbance was somewhat improved with his retirement and his ability to stay home. "I used to go to work totally sleep deprived ... I was always coming home so tired I couldn't do anything to catch up on my sleep, and I was having 2-3 nightmares a night." Id.

On April 30, 2007, Mr. Pelroy told Dr. Turner he was going to a hearing to determine whether his disability rating would be increased. Tr. 341. He said he was nervous about the hearing

---

http://www.veteransoutreachcenter.org/documents/PTSDTool2.pdf.

Findings and Recommendation Page 10

because

> I guess the hearing is the place where I tell them about
> the stress of the slaughterhouse, the gunshots that had
> to be used to put some of the animals down ... the guys
> who used a .30-.30 to shoot a bull that wouldn't come in
> or an M-16. The Hispanics at the slaughterhouse used to
> like to scare the shit out of me with the gunfire. I
> would have flashbacks to the rice paddies and so on,
> looking for where the gunfire was coming from. ...
> Collecting all the dead animals was tough. Cathy thought
> I was getting goofy and taking unnecessary risks with the
> animals and with my body on the job.

Id. Dr. Turner wrote that Mr. Pelroy's affect was anxious, and that

he talked a lot about "the difficulties he had continuing to work

before the end of his employment." Id. He also complained of

increasing problems with concentration and short term memory. Id.

On May 14, 2007, Mr. Pelroy referred to some friends that he

talked to in stores, LeRoy at Walmart and Les at Fred Meyer, as

well as some military associates that he socializes with. However,

he also told Dr. Turner he was concerned about his son's

illegitimate children. Tr. 339. He said he had been losing his

temper a lot, and that "everything's been bothering me again, more

than normal." Id. He said he felt stressed out being at home and

having his wife "give me orders all the time at home." Id. She had

recently fallen, so that it was "one thing after another, can you

get me a glass of water, can you get me my pills ... will you help

me to the bathroom." Id. He said he spent a good deal of his time

running errands for his wife and working in his garden. Id. Mr.

Pelroy said,

> I think I'm going to go looking at jobs. If I'm going to
> keep my unemployment, I have to document putting in
> applications. I don't have to take the jobs, but I have

Findings and Recommendation Page 11

> to document that I'm looking. So far, I have rejected
> jobs for flatbed trucks ... I have not [had] experience
> with that and it takes 5 years to learn how to do that
> securely.

Tr. 340.

On June 11, 2007, Mr. Pelroy told Dr. Turner his wife had started having seizures, for which she was on several medications, and had been sleeping a lot. Tr. 337. He reported having a nightmare and bruising her ribs. Id. Mr. Pelroy also said his disability rating had been increased. Id.

On June 25, 2007, Mr. Pelroy told Dr. Turner he had been looking for some sedentary volunteer work with the VA to have something to do with his time. Tr. 335. He noted that this would reduce his domestic stress from spending too much time at home. Id. Dr. Turner observed that Mr. Pelroy's wife

> was the one most insistent that his continuing work was
> damaging his physical and mental health, but once she
> insisted on his retirement and using his disability
> benefits, she seems to be uneasy about his adjustment to
> the retirement that she felt so strongly that he needed.

Id.

On July 9, 2007, Mr. Pelroy reported an exacerbation of his symptoms by fireworks on the Fourth of July, saying that he had driven his wife "nuts," "me and the dog walking the perimeter and falling asleep in the yard." Tr. 298-99. Dr. Turner noted that Mr. Pelroy's adjustment to retirement had been difficult because he felt "loss of meaning and purpose." Tr. 299. Mr. Pelroy discussed volunteering at the VA Clinic, stating, "I just wander around the house all day, nothing to do really." Id.

On August 6, 2007, Mr. Pelroy reported enjoying the company of

Findings and Recommendation Page 12

his grandchildren. Tr. 297. However, he was concerned about his wife's seizure disorder. Id. Dr. Turner noted that his thought process was "ruminative at times, circular." Id.

On August 15, 2007, Peter LeBray, Ph.D., performed a records review on behalf of the Commissioner. Tr. 240. In Dr. LeBray's opinion, Mr. Pelroy had anxiety and depression "with PTSD features."[3] Tr. 245. Dr. LeBray thought Mr. Pelroy had mild restrictions in his ADRs and in maintaining concentration, persistence or pace, and moderate difficulty in maintaining social functioning. Tr. 250.

On October 1, 2007, Mr. Pelroy told Dr. Turner his wife was upset because he didn't like to go out with her. Tr. 295. Mr. Pelroy said he would rather go up to his room and watch DVDs, but then "she tells me that I isolate too much in my room, but I like being alone." Id. Mr. Pelroy said he took her out occasionally to quiet restaurants, but found bars "too noisy and crazy." Id.

On October 15, 2007, Dr. Turner wrote that Mr. Pelroy reported being in a foul mood over the weekend, unable to tolerate his cat or dog, and not wanting to interact. Tr. 292. He was unable to identify anything in particular that he was angry about. Id. Mental status examination showed "cynical and irritable" attitude, labile mood, and tense affect. Tr. 293. On October 29, 2007, Dr. Turner noted continuing marital discord. Tr. 289.

---

[3] This diagnosis does not appear in any of Mr. Pelroy's mental health records. Dr. Turner and Dr. Leyva-Yapur diagnosed PTSD and depressive disorder; Dr. Leyva-Yapur also diagnosed impulse control disorder. See, e.g., tr. 304-326, 332.

On November 19, 2007, Mr. Pelroy's citalopram dosage was increased to address his anger. Tr. 415-16. On November 26, 2007, Mr. Pelroy said he was doing better after having his medications adjusted. Tr. 414. However, he reported noticing some short term memory deficits. Id.

On January 7, 2008, Mr. Pelroy told Dr. Turner he got through the fireworks on New Year's by taking "two of the green pills" and putting on ear protectors. Tr. 409. "I didn't hear a thing and avoided it all." Id. He said he had been doing OK except for flaring up with other drivers, although he is able to control his temper. Id.

On March 3, 2008, Mr. Pelroy told Dr. Turner he had turned in the paperwork to volunteer at dog control. Tr. 407.

On April 28, 2008, Dr. Turner wrote a letter to Mr. Pelroy's attorney. Tr. 438. He identified Mr. Pelroy's service connected disabilities as 70% for PTSD and a 10% for the leg injury. Id. Dr. Pelroy said his earliest encounter with Mr. Pelroy occurred on June 13, 2005, for an initial mental health assessment, but that Mr. Pelroy had been determined disabled by the VA through psychiatric assessments conducted by Dr. Levya-Yapur "as far back as July 27 of 2000." Tr. 439. Dr. Turner said he saw Mr. Pelroy every two weeks, and that before Dr. Turner, Mr. Pelroy had received counseling at the Eugene Vet Center from another PTSD specialist, although Dr. Turner did not have copies of those records. Id.

In Dr. Turner's opinion, Mr. Pelroy "experiences the full range of PTSD symptoms" and met Cluster A criteria for combat

Findings and Recommendation Page 14

trauma that would cause disabling PTSD; he "exhibited and still does exhibit most of the 17 symptoms of PTSD from DSM-IV." (I.e., the American Psychiatric Association's *Diagnostic and Statistical Manual*, Fourth edition).   Tr. 440.

Dr. Turner stated that he had reviewed the Mental Residual Functional Capacity Assessment forms completed on behalf of the Commissioner by Dr. LeBray and "strongly disagree[d]" with them, saying that his own ratings of Mr. Pelroy would in most instances fall in the "Markedly Limited" range. Id.

Dr. Turner observed that Mr. Pelroy was

not psychologically minded, has always been extremely stoic and disciplined not to complain about anything, even when he was barely functioning, sleepwalking through his days in a state of extreme dissociation. He simply is not insightful about is own behavior [or] impact on others. ... Unfortunately, this results in a very skewed and false impression of Mr. Pelroy's actual abilities or functional capacities.

Tr. 440.

On June 23, 2008, Mr. Pelroy told Dr. Turner that his wife and her business partner had "told me that I didn't have nothin' to do with this company that Cathy runs. They told me that they only allowed me to go over there because they thought that I was just easing into retirement and maybe needed something to do. I felt really let down and used. They weren't really exploiting me or anything ... I guess I just thought that I was disinvited from participating in the company." Tr. 464.

On July 21, 2008, Dr. Turner saw Mr. Pelroy and his wife together. Tr. 460. Ms. DeWolf related that she had invested an $80,000 inheritance into a business that "failed miserably." Tr.

Findings and Recommendation Page 15

460. She said, "I thought that Ed would feel useful if he went over to the business and hung out with people there. He didn't really work there. It was a one man business. ... He had no role or position in my business; he simply went over and talked to the men who worked for me ... until it went bankrupt and we/I closed it up." Tr. 460-61. At that session, Mr. Pelroy's wife said he had "gotten angrier and angrier. I think he's angry at me, angry with himself." Tr. 461. Mr. Pelroy described being angry as "just part of my everyday life." Id.

In a session with Mr. Pelroy on October 30, 2008, Dr. Turner followed up on longstanding sexual intimacy issues between Mr. Pelroy and his wife, and noted, "The veteran remains avoidant of intimate contact with his spouse, and rationalizes that he is responding to her illness and lack of well-being. The veteran does not seem capable of emotional expression or intimacy approaches with his spouse or others. ... Veteran seems stuck with disabling symptoms as described and the therapist sees little/no movement in these issues. ..." Tr. 488.

On December 1, 2008, Dr. Turner completed a form submitted by Mr. Pelroy's attorney. Tr. 476-80. On the form Dr. Turner responded to some of the ALJ's findings, opining as follows:

1.   Mr. Pelroy's PTSD would be expected to interfere with his capacity to sustain jobs as a Construction Worker II and Heavy Machine Operator, as described in the DOT, because Mr. Pelroy was often dissociated, unable to connect with others emotionally, and struggling to contain his PTSD

Findings and Recommendation Page 16

symptoms and secondary depression. Tr. 476.

2.    Problems with marital and financial issues are common to individuals with PTSD because "PTSD victims have extreme difficulty in entering or sustaining intimacy. They are guarded, emotionally numbed... in Mr. Pelroy's case the failure of intimacy is near complete due to his PTSD." Tr. 477.

3.    The stress of fulltime employment would be expected to exacerbate Mr. Pelroy's symptoms, even if supervision were structured or normal because Mr. Pelroy

> does poorly interacting with others, and prior to his total unemployability was able only to drive a truck loaded with dead animal carcasses and road kill that he also attended to. He did this work in isolation for years until it began to overtax his coping with PTSD and depression. Handling death daily, smelling it, loading it was not a job that invited the company of others and in my opinion, is why Mr. Pelroy stuck with it beyond reasonable mental and physical limits.

Tr. 478.

4.    Dr. Turner's experience with other veterans provided him with a basis for his conclusions because a third to half of his patients had been diagnosed with PTSD from combat conditions, and he conducts 11 disability examinations per week for veterans with PTSD, Traumatic Brain Injury and other mental disorders related to military service. Tr. 479.

///

Findings and Recommendation Page 17

**Hearing Testimony**

Mr. Pelroy testified that he had spent the previous seven years as a truck driver, picking up and disposing of animal carcasses. Tr. 29. He said the job "brought out a lot of stuff inside of me that I had done in the service," and that he had been quartering cattle and throwing them in the truck until "it got to a point where I just couldn't lift them anymore and I didn't have a partner to help me out." Tr. 31. Mr. Pelroy said the job also "worked on my nerves," because he saw people doing stupid things on the road and would lose his temper. Tr. 32. Mr. Pelroy testified to not getting along with some of his co-workers and supervisors. Tr. 41-42. He said he had nightmares about three times a week, and then had to get out of bed for ten minutes to half an hour to get his mind off the dream. Tr. 47-48.

He sees a counselor at the Eugene Vet Center every other week, and sees Dr. Turner every other week. Tr. 49. Mr. Pelroy testified that seeing the counselors helps him deal with his irritability. Tr. 49. Mr. Pelroy said that "at times my wife drives me nuts in the house," and that he and his wife "fight a lot," so that he spends most of his time in his room watching movies. Tr. 43, 54.

The ALJ called a vocational expert (VE), Mark McGowan. Tr. 59. Mr. McGowan described Mr. Pelroy's work picking up animal carcasses as between heavy and very heavy exertion as performed. Tr. 60. His past work as a construction worker was characterized as very heavy work. Tr. 61. His past work as a heavy equipment operator was listed as medium in the Dictionary of Occupational Titles (DOT),

Findings and Recommendation Page 18

but very heavy as performed. Id.

The ALJ asked the VE to consider a hypothetical individual who was able to perform work at the medium exertional level, but restricted to no required contact with the general public and brief structured contact with co-workers and supervisors. Tr. 62. The VE opined that such an individual could do the construction worker occupation as he had described it and the heavy equipment operator job. Id.; tr. 64.

**Lay Witness Evidence**

Thomas Feeken wrote a letter on Mr. Pelroy's behalf on August 8, 2008. Tr. 239. He said he had been friends with Mr. Pelroy for four years, and during the past year had seen him about twice a week. Id. He said Mr. Pelroy would come by the shop where he and another man worked, bring their lunch, and watch movies on the computer. Id. Mr. Feeken said Mr. Pelroy "doesn't get out much as he doesn't do well in social situations, around crowds, or around loud noises. ... [F]or the most part he is a loner." Id.

Mr. Pelroy's wife, Catherine DeWolf, completed a Third Party Function Report on August 7, 2007. Tr. 194-201. She stated that her husband had "horrible nightmares and when awakened suddenly can become violent from flashbacks." Tr. 195. She said he watched DVDs and movies "all the time," and that he didn't "like being involved with family, friends or me much--very isolated ... he has gotten worse as far as family." Tr. 199. She also wrote that Mr. Pelroy would "'freak out' if he feels someone is in 'harm's way' and watch out for the Fourth of July ... fireworks set him off horribly." Tr.

Findings and Recommendation Page 19

200.

## ALJ's Decision

The ALJ found that Mr. Pelroy's severe impairments were PTSD, depressive disorder, and alcohol abuse. Tr. 14. She also noted that Mr. Pelroy "mentioned in passing issues with his back as one of his reasons for leaving his last job." Id. However, the ALJ found no treatment records for the spine, and also found that the VA records, specifically those of Dr. Turner, reported that Mr. Pelroy quit his job "due to general physical concerns related to his age and difficulties lifting up to 150 pounds by himself on a regular sustained basis." Id. The ALJ concluded that the "reason that Mr. Pelroy quit or retired from his job was related to mental health reasons according to the VA records," and his wife's "insistence that he retire." Id.

The ALJ found that Mr. Pelroy was performing his previous job at the heavy to very heavy exertion level, "which most individuals of his age group would have some complaints of sustaining on a continual basis." However, she concluded that "the physical difficulties related to the performance of his last job as an animal carcass remover/truck driver would not preclude[] all jobs in the workforce." Tr. 15. She based this conclusion on Mr. Pelroy's ability to garden, travel to visit family, dance, and pick up his wife and carry her when she had seizures. Id.

The ALJ adopted the opinions of reviewing psychologist LeBray, finding that Mr. Pelroy had mild restrictions in the activities of daily living (ADRs) and maintaining concentration, persistence or

pace; moderate difficulties in maintaining social functioning; and no episodes of decompensation. Id. The ALJ noted that Mr. Pelroy had a tendency to isolate himself, but that "review of the overall record" indicated that he had good relationships with his family and his spouse's family. Id. The ALJ noted his reports of nightmares, but also that he "reported no difficulties in returning to sleep" once he had recovered from them.

As for social functioning, the ALJ noted Mr. Pelroy's reports of spurts of anger and difficulty with loud noises, but concluded that "review of the record indicates that Mr. Pelroy has no difficulties in his ability to socialize with individuals as in shop [sic] and meet with friends, help out his neighbor, stop by to chat with people on his old truck driving route, help brighten the day of workers for his wife's part owned business," as well as dance and "go out to eat at quieter restaurants." Id., tr. 16. The ALJ took note of VA records indicating that Mr. Pelroy tended to go out and not return for hours as he "stopped to converse with different individuals to whom [sic] he was acquainted." Tr. 16. The ALJ noted that at the hearing, Mr. Pelroy "confirmed that he enjoyed going to the various stores and talking to a few people." Id.

The ALJ found that Mr. Pelroy had the RFC to perform medium work, with the restriction of no required contact with the general public, brief structured co-worker contact, and structured supervisor contact. Id.

///

The ALJ acknowledged that ordinarily, great weight is given to the VA's determination of disability unless valid reasons exist for diverging from its findings, citing McCartey v. Massanari, 298 F.3d 1072, 1076 (9th Cir. 2002). However, because the ALJ found that the VA's determination was "based on a standard of disability that differs from the law applicable in Social Security cases," she did not give the agency's decision significant weight. Id.[4] She observed that in 2004, the VA had found Mr. Pelroy 70% disabled "due to PTSD symptoms that manifested more than 25 years later, at a time when he was employed fulltime," and that after the VA's 2004 decision, Mr. Pelroy had continued to perform his job for an additional three years. Id. The ALJ found that VA records indicated that Mr. Pelroy quit his job as an animal carcass remover/truck driver on the alleged onset date because he was

> troubled by coming home covered in blood and he was lifting upwards of 150 pounds at a time without assistance. Mr. Pelroy was also upset about verbal abuse he regularly received from a neighbor of the lot where the animal retrieval truck and its unpleasant contents were parked. Mr. Pelroy reported that he had difficulties with controlling his temper while driving and would impulsively follow offending drivers and yell at them.

Tr. 17.

The ALJ made an adverse credibility finding on the ground that Mr. Pelroy had "considered applying for unemployment compensation

---

[4] The ALJ clarified that the Commissioner "utilizes an all or nothing total disability standard," where there is "no partial disability." Tr. 17. Additionally, the ALJ found the VA disability rating "questionable," because "Mr. Pelroy's VA records fail to substantiate his overall allegations of inability to sustain all competitive employment." Id.

Findings and Recommendation Page 22

in order to supplement his VA disability pension with no actual intention of following through with the jobs that he had to apply for in order to obtain benefits." Tr. 18. Additionally, the ALJ found that although VA records indicated that a business venture by Mr. Pelroy's wife using an inheritance was referred to as "ours," later Mr. Pelroy and his wife were "explicit to try and disconnect him from the business venture altogether. This was done with the couple presenting to Dr. Turner's office to complain about how not involved Mr. Pelroy was with the business venture." Id. The ALJ concluded that these "types of statements and reports in the evidence of record raise issues of credibility as to Mr. Pelroy's reports and testimony as well as secondary gain motives for his spouse." Id.

The ALJ gave "no significant weight" to Dr. Turner's opinion that Mr. Pelroy had marked limitations on his ADRs, social functioning, and concentration, persistence and pace, "as it is uncorroborated by Dr. Turner's own medical records," which the ALJ found to consist primarily of reports about Mr. Pelroy's marital and financial problems rather than his ability to sustain competitive employment. Id.

The ALJ concluded, on the basis of the VE's testimony, that Mr. Pelroy had the ability to perform his past relevant work as construction worker II and heavy machine operator as listed in the DOT but not at the heavy to very heavy level at which Mr. Pelroy had performed it. Tr. 19.

///

Findings and Recommendation Page 23

**Standard**

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record. Meanel v. Apfel, 172 F.3d 1111, 1113 (9th Cir. 1999). Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. Richardson v. Perales, 402 U.S. 389, 401 (1971); Andrews v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995). In determining whether the Commissioner's findings are supported by substantial evidence, the court must review the administrative record as a whole, weighing both the evidence that supports and the evidence that detracts from the Commissioner's conclusion. Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1998). However, the Commissioner's decision must be upheld even if "the evidence is susceptible to more than one rational interpretation." Andrews, 53 F.3d at 1039-40.

The initial burden of proving disability rests on the claimant. Meanel, 172 F.3d at 1113; Johnson v. Shalala, 60 F.3d 1428, 1432 (9th Cir. 1995). To meet this burden, the claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which ... has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A).

A physical or mental impairment is "an impairment that results from anatomical, physiological, or psychological abnormalities

which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. § 423(d)(3). This means an impairment must be medically determinable before it is considered disabling.

The Commissioner has established a five-step sequential process for determining whether a person is disabled. Bowen v. Yuckert, 482 U.S. 137, 140 (1987); 20 C.F.R. §§ 404.1520, 416.920.

In step one, the Commissioner determines whether the claimant has engaged in any substantial gainful activity. 20 C.F.R. §§ 404.1520(b), 416.920(b). If not, the Commissioner goes to step two, to determine whether the claimant has a "medically severe impairment or combination of impairments." Yuckert, 482 U.S. at 140-41; 20 C.F.R. §§ 404.1520(c), 416.920(c). That determination is governed by the "severity regulation," which provides:

> If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled. We will not consider your age, education, and work experience.

§§ 404.1520(c), 416.920(c). If the claimant does not have a severe impairment or combination of impairments, the disability claim is denied. If the impairment is severe, the evaluation proceeds to the third step. Yuckert, 482 U.S. at 141.

In step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to preclude substantial gainful activity." Yuckert, 482 U.S. at 140-41. If a

Findings and Recommendation Page 25

claimant's impairment meets or equals one of the listed impairments, he is considered disabled without consideration of her age, education or work experience. 20 C.F.R. s 404.1520(d), 416.920(d).

If the impairment is considered severe, but does not meet or equal a listed impairment, the Commissioner considers, at step four, whether the claimant can still perform "past relevant work." 20 C.F.R. §§ 404.1520(e), 416.920(e). If the claimant can do so, he is not considered disabled. Yuckert, 482 U.S. at 141-42. If the claimant shows an inability to perform his past work, the burden shifts to the Commissioner to show, in step five, that the claimant has the RFC to do other work in consideration of the claimant's age, education and past work experience. Yuckert, 482 U.S. at 141-42; 20 C.F.R. §§ 404.1520(f), 416.920(f).

**Discussion**

Mr. Pelroy asserts that the Commissioner's decision should be reversed and remanded for an award of benefits, based on four errors made by the ALJ: 1) failure to give clear and convincing reasons for rejecting the opinions of Dr. Turner; 2) failure to give sufficient weight to the VA award of disability; 3) failure to give clear and convincing reasons for rejecting Mr. Pelroy's testimony; and 4) failure to consider the written statements of Mr. Pelroy's wife.

**1.    Rejection of Dr. Turner's opinions**

Title II's implementing regulations distinguish among the opinions of three types of physicians: 1) those who treat the

claimant; 2) those who examine but do not treat; and 3) those who neither examine nor treat. Holohan v. Massanari, 246 F.3d 1195, 1201 (9th Cir. 2001); Lester v. Chater, 81 F.3d 821, 830 (9th Cir. 1995); 20 C.F.R. § 404.1527(d). Generally, a treating physician's opinion carries more weight than an examining physician's and an examining physician's opinion carries more weight than a reviewing physician's. Holohan, 246 F.3d at 1202; Lester, 81 F.3d at 830; 20 C.F.R. § 404.1527(d).

Under the regulations, if a treating physician's medical opinion is supported by medically acceptable diagnostic techniques and is not inconsistent with other substantial evidence in the record, the treating physician's opinion is given controlling weight. Holohan, 246 F.3d at 1202; 20 C.F.R. § 404.1527(d)(2). An ALJ may reject the uncontradicted medical opinion of a treating physician only for "clear and convincing" reasons supported by substantial evidence in the record. Id. at 1202, citing Reddick, 157 F.3d at 725. If the treating physician's medical opinion is inconsistent with other substantial evidence in the record, treating source medical opinions are still entitled to deference and must be weighted using all the factors provided in 20 C.F.R. § 404.1527. Id. An ALJ may rely on the medical opinion of a non-treating doctor instead of the contrary opinion of a treating doctor only if the ALJ provides "specific and legitimate" reasons supported by substantial evidence in the record. Id. Similarly, an ALJ may reject a treating physician's uncontradicted opinion on the ultimate issue of disability only with "clear and convincing"

Findings and Recommendation Page 27

reasons supported by substantial evidence in the record. Id. If the treating physician's opinion on the issue of disability is controverted, the ALJ must still provide "specific and legitimate" reasons in order to reject the treating physician's opinion. Id.

If a treating physician's opinion is not given controlling weight, the ALJ is to consider specified factors in determining the weight it will be given. Orn v. Astrue, 495 F.3d 625, 631 (9th Cir. 2007). These factors include the length of the treatment relationship and the frequency of examination by the treating physician, and the nature and extent of the treatment relationship. Id., citing 20 C.F.R. § 404.1527(d)(2)(i)-(ii).

The ALJ failed to consider any of the factors articulated at 20 C.F.R. § 404.1527(d)(2)(i)-(ii). None supports the ALJ's finding that Dr. Turner's opinions were entitled to "no significant weight." Dr. Turner saw Mr. Pelroy approximately twice a month for 50-minute counseling sessions over a period of three and a half years. The counseling sessions covered a wide range of topics and often included mental status examinations; are all extensively documented. These circumstances weigh in favor of Dr. Turner's opinions.

Additional factors relevant to evaluating any medical opinion, not limited to the opinion of the treating physician, include the amount of relevant evidence that supports the opinion and the quality of the explanation provided; the consistency of the medical opinion with the record as a whole; and the specialty of the physician providing the opinion. Orn at 631, citing 20 C.F.R. §

404.1527(d)(3)-(6). Again, these factors favor Dr. Turner's opinions over those of Dr. LeBray. Dr. LeBray's opinions are supported by a brief summary of Dr. Turner's records. Dr. Turner's records are based on a long treatment relationship with Mr. Pelroy as well as communications from Mr. Pelroy's wife. Dr. Turner's opinions are comprehensive and longitudinal; Dr. LeBray's opinions were rendered only once. Dr. Leyva-Yapur's diagnosis is the same as that of Dr. Turner; Dr. LeBray's diagnosis appears nowhere else in the record.

Despite the inconsistency between Dr. Turner's opinions and those of Dr. LeBray, a finding that a treating medical source's opinion is inconsistent with other evidence in the record does not warrant the ALJ's rejection of that evidence; it means only that the opinion is not entitled to "controlling weight." Orn, 495 F.3d at 631-32.

The ALJ gave no weight to Dr. Turner's opinion that Mr. Pelroy had marked limitations on his ADRs, social functioning, concentration, persistence or pace, because his assessment, according to the ALJ, was "uncorroborated by Dr. Turner's own medical records," which the ALJ found not to address Mr. Pelroy's ability to sustain competitive employment. The ALJ's finding is erroneous for several reasons.

The only evidence in the record that is inconsistent with Dr. Turner's clinical findings is the assessment by Dr. LeBray that Mr. Pelroy had only mild to moderate limitations in the areas of ADRs, concentration persistence and pace, and social functioning. Because

Dr. LeBray neither treated, nor examined Mr. Pelroy, he necessarily relied on Dr. Turner's records to arrive at his opinions; this is demonstrated by the fact that the only records referred to in the explanatory portion of Dr. LeBray's assessment are those of Dr. Turner. Tr. 252.

The ALJ did not identify any reason why Dr. Turner's records failed to corroborate Dr. Turner's opinions, but did corroborate the contradictory opinions of Doctor LeBray. In view of the far greater evidentiary weight accorded to Dr. Turner's opinions, the ALJ's reason for rejecting Dr. Turner's opinions in favor of Doctor LeBray's was neither specific and legitimate, nor based on substantial evidence in the record.

The ALJ's finding that Dr. Turner's opinions were without evidentiary value because his records dealt only with Mr. Pelroy's marital and financial problems rather than his ability to sustain competitive employment is similarly unconvincing. The ALJ's interpretation of the records is improperly narrow and restrictive, in view of the judicial admonition that medical records are to be read in the context of the overall diagnostic picture. Holohan, 246 F.3d at 1205. Dr. Turner's records contain numerous references to difficulties Mr. Pelroy was having at work, see, e.g., tr. 376, 372, 366, 357, 346, 341. More importantly, Dr. Turner's records contain numerous references to mental conditions that would be expected to limit an individual's ability to engage in employment-related functions such as maintaining concentration, persistence and pace, and interacting with others: impulsivity, anger,

irritability, apathy, depression, dissociation and being "spaced out," social avoidance, sleep disturbances, anxiety, hyper-vigilance, memory impairments, and poor interactions with supervisors and co-workers. The ALJ failed to consider this evidence, focusing instead on references to apparently brief and superficial interactions with two of his wife's employees, employees of stores where he shopped, a neighbor, and some former customers, and two descriptions of taking his wife to a restaurant. Tr. 15-16. The ALJ's reliance on these portions of Dr. Turner's records, and disregard of almost everything else generated by Dr. Turner including mental status examinations, diagnoses, and clinical assessments, constitutes a failure to consider the evidence as a whole and in context. Further, the ALJ may not reject "significant probative evidence" without explanation. <u>Flores v. Shalala</u>, 49 F.3d 562, 571 (9th Cir. 1995). This, in conjunction with the ALJ's failure to articulate any reason for finding that Dr. Turner's records did not corroborate his own opinions, but corroborated those of Dr. LeBray, or to apply the proper standards for evaluating the relative weight of Dr. LeBray's diagnosis and assessments against those of Dr. Turner and Dr. Leyva-Yapur, lead me to conclude that the ALJ's rejection of Dr. Turner's opinions was legally erroneous and unsupported by substantial evidence in the record.

When an abundance of evidence supports the improperly rejected opinions of a treating practitioner, it is appropriate to credit those opinions as true, even when the record contains evidence

capable of supporting the rejection of those opinions. <u>Lester v.</u>
<u>Chater</u>, 81 F.3d 821, 834 (9th Cir. 1996); <u>Harman v. Apfel</u>, 211 F.3d
1172, 1178-79 (9th Cir. 2000).

### Credibility

The ALJ is responsible for determining credibility. <u>Andrews</u>,
53 F.3d at 1039. However, the ALJ's credibility findings must be
supported by specific, cogent reasons. <u>Reddick</u>, 157 F.3d at 722.
When, as is the case here, there is no affirmative evidence showing
that the claimant is malingering, the ALJ's reasons for rejecting
the claimant's subjective testimony must be "clear and convincing."
<u>Id</u>. The ALJ must identify what testimony is not credible and what
evidence undermines the claimant's complaints. <u>Id.</u> The evidence
upon which the ALJ relies must be substantial. <u>Id.</u> at 724. See also
<u>Holohan</u>, 246 F.3d at 1208 (same). General findings (e.g., "record
in general" indicates improvement) are an insufficient basis to
support an adverse credibility determination. <u>Reddick</u> at 722; see
also <u>Holohan</u>, 246 F.3d at 1208. Examples of clear and convincing
reasons include conflicting medical evidence, effective medical
treatment, medical noncompliance, inconsistent statements, daily
activities inconsistent with the alleged symptoms, a sparse work
history, or testimony that is vague or less than candid. <u>Tommasetti</u>
<u>v. Astrue</u>, 533 F.3d 1035, 1040 (9th Cir. 2008); <u>Lingenfelter v.</u>
<u>Astrue</u>, 504 F.3d 1028, 1040 (9th Cir. 2007).

The ALJ made an adverse credibility finding on the ground that
Mr. Pelroy had "considered applying for unemployment compensation
in order to supplement his VA disability pension with no actual

Findings and Recommendation Page 32

intention of following through with the jobs that he had to apply for in order to obtain benefits." Tr. 18. This finding is not accurate. Nowhere in the evidence cited by the ALJ (which is quoted above at page 11) did Mr. Pelroy actually say, or suggest an inference that, he had no actual intention of following through with job applications. He simply said that 1) in order to qualify for unemployment, he had to document putting in job applications, though he did not have to take the jobs; and 2) that he had not taken jobs driving flatbed trucks because he had no experience with them and he thought it took several years to learn how to drive them safely. Moreover, Dr. Turner's reports indicate that on several occasions, Mr. Pelroy expressed the desire to find some activity, either a job or a volunteer opportunity, for something to do.

The ALJ found that although VA records indicated that a business venture by Mr. Pelroy's wife using an inheritance was referred to as "ours," later Mr. Pelroy and his wife were "explicit to try and disconnect him from the business venture altogether." Id.[5] The ALJ concluded that these "types of statements and reports in the evidence of record raise issues of credibility as to Mr.

---

[5] There are several other references in the record to Mr. Pelroy's lack of involvement in his wife's business. See, e.g., tr. 425 ("The veteran has been going to the shop she has invested in, and offering to lend a hand if he can. They decline his help often as he does not have electronics experience."); tr. 464 (telling Dr. Turner his wife and her business partner told him they only allowed him to go to the business because they thought he needed something to do, and "disinviting" him from participating).

Pelroy's reports and testimony as well as secondary gain motives for his spouse." Id. This conclusion ignores the very real problems of involving a person like Mr. Pelroy, who has very significant problems relating to the public even in the ALJ's opinion, with a new business.

Even if referring to a business owned by one's spouse as "ours," while maintaining that one is not involved in the business venture were indicative of untruthfulness--a dubious proposition-- it is not a clear and convincing reason, based on substantial evidence, for concluding that Mr. Pelroy's testimony was unworthy of belief in its entirety.

Further, this court has disapproved an ALJ's determination that a claimant and his spouse were not credible because they were motivated by the desire for "secondary gain."

> By definition, every claimant who applies for Title II benefits does so with the knowledge--and intent--of pecuniary gain. That is the very purpose of applying for Title II benefits. The same motivation afflicts every applicant for workers compensation benefits, and every personal injury plaintiff. If the desire or expectation of obtaining benefits were by itself sufficient to discredit a claimant's testimony, then no claimant (or spouse, or friend, or family) would ever be found credible.

Ratto v. Secy, 839 F. Supp. 1415, 1428-29 (D. Or. 1993).

The ALJ's credibility findings are not clear and convincing and are not supported by substantial evidence in the record.

A claimant's testimony must be accepted as true when it is inadequately rejected by the ALJ. Varney v. Secretary of Health and Human Services, 859 F.2d 1396, 1398-99 (9th Cir. 1988). See also Benecke v. Barnhart, 379 F.3d 587 (9th Cir. 2004) and Moisa v.

Findings and Recommendation Page 34

1  Barnhart, 367 F.3d 882 (9th Cir. 2004).

2                          **VA disability**

3       In McCartey v. Massanari, 298 F.3d 1072 (9th Cir. 2002), the

4  court held, as a matter of first impression, that the ALJ must

5  ordinarily give great weight to a VA determination of disability.

6  The court did so because of the "marked similarity between these

7  two federal disability programs." 298 F.3d at 1076. However,

8  because the VA and SSA criteria for determining disability are not

9  identical, the ALJ may give less weight to a VA disability rating

10 if he gives persuasive, specific, valid reasons for doing so that

11 are supported by the record. Id.

12      The ALJ declined to give the VA's disability decision any

13 significant weight because Mr. Pelroy's PTSD symptoms manifested

14 more than 25 years after combat and while he was employed. The

15 ALJ's finding that Mr. Pelroy's PTSD symptoms did not manifest

16 themselves for 25 years is not supported by substantial evidence.

17 Although the medical records before the ALJ do not go back to the

18 time Mr. Pelroy served in Vietnam, they do indicate that as of

19 2004, he had a 50% disability rating from the VA for PTSD. This

20 does not support the ALJ's assumption of a that Mr. Pelroy's PTSD

21 symptoms suddenly emerged 25 years after his military service. The

22 record does not establish when Mr. Pelroy's PTSD first manifested

23 itself.

24      The ALJ's finding that Mr. Pelroy was employed until February

25 2007 does affect the weight of the VA's disability decision,

26 because under SSA rules, a person engaged in substantial gainful

27

28 Findings and Recommendation Page 35

activity is not considered disabled. I conclude that this is a valid reason for giving something less than "great weight" to the VA's disability determination.

The ALJ noted that although Dr. Turner's treatment records mentioned "consistently that Mr. Pelroy was found 100% disabled, the VA records ... show[] only a rating of 70%," because the VA had found the evidence did not show "total occupational and social impairment as defined under the rating schedule." Id.[6]

---

[6] The VA's rating formula for mental disorders supports the ALJ's finding. A 100% disability rating is based on

> such symptoms as: gross impairment in thought processes
> or communication; persistent delusions or
> hallucinations; grossly inappropriate behavior;
> persistent danger of hurting self or others;
> intermittent inability to perform activities of daily
> living (including maintenance of minimal personal
> hygiene); disorientation to time or place; memory loss
> for names of close relatives, own occupation or own
> name.

///

Tr. 160. The record does not indicate such severe symptoms for Mr. Pelroy. A 70% rating is defined as

> [o]ccupational and social impairment, with deficiencies
> in most areas, such as work, school, family relations,
> judgment, thinking, or mood, due to such symptoms as:
> suicidal ideation; obsessional rituals which interfere
> with routine activities; speech intermittently
> illogical, obscure or irrelevant; near continuous panic
> or depression affecting the ability to function
> independently, appropriately and effectively; impaired
> impulse control (such as unprovoked irritability with
> periods of violence); spatial disorientation; neglect
> of personal appearance and hygiene, difficulty in
> adapting to stressful circumstances (including work or
> a worklike setting); inability to establish and
> maintain effective relationships.

Findings and Recommendation Page 36

1  I conclude that the ALJ's consideration of the VA disability

2  rating was not erroneous.

3                    **Lay witness testimony**

4      In her decision, the ALJ wrote that she "considered the third-

5  party statements in arriving at the residual functional capacity."

6  Tr. 19. However, she did not mention the statements of Mr. Pelroy's

7  wife or the third party statement by Thomas Feeken.

8      Lay testimony as to a claimant's symptoms is competent

9  evidence which the ALJ must take into account, Dodrill v. Shalala,

10  12 F.3d 915, 919 (9th Cir. 1993) unless she expressly determines to

11  disregard such testimony, in which case "[she] must give reasons

12  that are germane to each witness." Id. See also Stout v.

13  Commissioner, 454 F.3d 1050, 1053 (9th Cir. 2006). While lay

14  witnesses are not competent to testify to medical diagnoses, they

15  may testify as to a claimant's symptoms or how an impairment

16  affects ability to work. Nguyen v. Chater, 100 F.3d 1462 (9th Cir.

17  1996); Sprague v. Bowen, 812 F.2d 1226, 1232 (9th Cir. 1987). Such

18  testimony cannot be disregarded without comment. Id.

19      In Stout, the court held that an ALJ's failure to comment on

20  competent lay testimony requires reversal unless the court can

21  "confidently conclude" that no reasonable ALJ, when fully crediting

22  the testimony, could have reached a different disability

23  determination. 454 F.3d at 1056. The court is unable to conclude

24  that no reasonable ALJ, when fully crediting the testimony of Mr.

25  Pelroy's wife and Mr. Feeken, could have reached a conclusion that

26  _____

27  Tr. 160-61.

28  Findings and Recommendation Page 37

Mr. Pelroy was disabled. The ALJ's failure to mention or evaluate the lay testimony in the record was error.

## Remand

Sentence four of 42 U.S.C. § 405(g) gives the court discretion to decide whether to remand for further proceedings or for an award of benefits. <u>Harman v. Apfel</u>, 211 F.3d 1172, 1179 (9th Cir. 2000).

In <u>Smolen v. Chater</u>, 80 F.3d 1273, 1292 (9th Cir. 1996), the court held that improperly rejected evidence should be credited and an immediate award of benefits be made when: 1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence, 2) there are no outstanding issues that must be resolved before a determination of disability can be made, and 3) it is clear from the record that the ALJ would be required to find the claimant disabled were such evidence credited.

If the <u>Smolen</u> test is satisfied, then remand for payment of benefits is warranted regardless of whether the ALJ *might* have articulated a justification for rejecting the doctor's opinion. <u>Harman</u>, 211 F.3d at 1173 (emphasis in original). See also <u>Benecke</u> 379 F.3d 587 (9th Cir. 2004).

## Conclusion

I recommend that the opinions of Dr. Turner and the testimony of Mr. Pelroy be credited as true, and that this case be reversed and remanded for the payment of benefits.

## Scheduling Order

These Findings and Recommendation will be referred to a district judge. Objections, if any, are due by October 18, 2010.

Findings and Recommendation Page 38

If no objections are filed, then the Findings and Recommendation will go under advisement on that date. If objections are filed, then a response is due by November 4, 2010.  When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

        Dated this <u>28th</u> day of <u>September</u>, 2010.

                                /s/ Dennis J. Hubel

                                _____

                                    Dennis James Hubel
                                United States Magistrate Judge

Findings and Recommendation Page 39